IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**TERRY GOODWIN**                                                                          **PLAINTIFF**

**v.**                            **Case No.: 3:18-cv-00022-LPR**

**NIBCO, INC.**                                                                          **DEFENDANT**

## ORDER

Plaintiff Terry Goodwin sued Defendant NIBCO, Inc. for discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*[1]  NIBCO has filed a Motion for Summary Judgment.[2]  On May 5, 2021, the Court held a hearing on the Motion.  For the reasons that follow, the Court now GRANTS the Motion for Summary Judgment.[3]

---

[1]  Pl.'s Am. Compl. (Doc. 7) ¶¶ 25–47.

[2]  Def.'s Mot. for Summ. J. (Doc. 48).

[3]  The Court makes this ruling without the benefit of any briefing from Mr. Goodwin.  NIBCO filed its Motion for Summary Judgment on October 30, 2020.  *Id.*  Under the local rules, Mr. Goodwin's response was due by November 14, 2020.  On that date, Mr. Goodwin requested to extend the deadline to respond to December 15, 2020.  Pl.'s First Mot. for Extension (Doc. 51) at 6.  The Court granted that request in part.  *See* Order (Doc. 53) (extending Mr. Goodwin's deadline to November 30, 2020).  On November 25, 2020, Mr. Goodwin requested another extension, this time to December 15, 2020.  Pl.'s Second Mot. for Extension (Doc. 54) at 4.  The Court obliged.  *See* Order (Doc. 55) (extending Mr. Goodwin's deadline to December 15, 2020).  On December 13, 2020, Mr. Goodwin requested another extension, this time to January 8, 2021.  Pl.'s Third Mot. for Extension (Doc. 56) at 6.  Again, the Court obliged.  *See* Order (Doc. 58) (extending Mr. Goodwin's deadline to January 8, 2021).  On January 6, 2021, Mr. Goodwin requested another extension, seeking up to January 23, 2021, to file his response.  Pl.'s Fourth Mot. for Extension (Doc. 59) at 5.  Again, the Court obliged in part.  *See* Order (Doc. 61) (extending Mr. Goodwin's deadline to January 15, 2021).  After the Court's January 15, 2021 deadline passed, Mr. Goodwin sought another extension.  Pl.'s Fifth Mot. for Extension (Doc. 65) at 2.  The Court denied this request.  Order (Doc. 68).  Mr. Goodwin did file a Declaration of Authenticity, which included numerous exhibits, and a Response to Defendant's Statement of Undisputed Material Facts.  Pl.'s Decl. of Authenticity (Doc. 63); Pl.'s Resp. to Statement of Facts (Doc. 64).  The Court carefully considered these submissions.  Mr. Goodwin did not, however, submit a brief in opposition to Defendant's Motion for Summary Judgment.

### Background[4]

NIBCO manufactures valves for "oil production [companies], such as ARAMCO (Saudi Arabia American Oil Company), and commercial water treatment systems . . . ."[5]  NIBCO has a facility in Blytheville, Arkansas.[6]  Mr. Goodwin worked at that facility from 1976 until his termination in December 2017, forty-one years.[7]  In 1998, Mr. Goodwin "was promoted to Quality Assurance Manager," and in 2000, NIBCO assigned to Mr. Goodwin "additional responsibilities for Safety and Environmental Services."[8]  Mr. Goodwin was also a member of NIBCO's Senior Leadership Team.[9]

### A. *Mr. Cunningham Promoted to Plant Manager*

In November 2015, Jeffrey Cunningham became the Plant Manager at NIBCO's Blytheville facility.[10]  Among other things, that made him Mr. Goodwin's direct supervisor.[11]  In a letter written to Mr. Cunningham soon after he became Plant Manager, Mr. Goodwin explained that Rob Brooks was Mr. Goodwin's "right hand" and that Mr. Brooks should "be prepared if possible as a candidate to step in for me when I retire or something unforeseen occurs . . . ."[12]

---

[4] Where a Defendant moves for summary judgment, the Court relies on undisputed facts and takes the genuinely disputed facts in a light most favorable to the Plaintiff, including giving the Plaintiff all reasonable inferences from the facts.  Essentially, the Court considers the most pro-Plaintiff version of the record that a rational juror could conclude occurred.  The Court's factual recitation is therefore only good for the summary judgment motion.

[5]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 1.

[6]  *Id.* ¶ 2.

[7]  *Id.* ¶¶ 3, 87.

[8]  *Id.* ¶ 4.

[9]  *See id.* ¶ 44 (discussing Mr. Goodwin's removal from the Senior Leadership Team).

[10]  *Id.* ¶ 6; Cunningham Decl. (Doc. 48-1) ¶ 3.

[11]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 6.

[12]  Ex. D to Cunningham Decl. (Doc. 48-2) at 11–12; *see also* Cunningham Decl. (Doc. 48-1) ¶ 7 (stating that Mr. Goodwin prepared the letter in 2015).  The Court's pagination for exhibits in the record refers to the page numbering in the Clerk's file stamp.

In February or March 2016, Mr. Cunningham asked Mr. Goodwin about Mr. Goodwin's retirement plans.[13]  Mr. Goodwin said that he intended to work for at least five to seven more years.[14]  Mr. Cunningham then said to Mr. Goodwin that Rob Brooks could succeed Mr. Goodwin.[15]  In response to this statement, Mr. Goodwin said to Mr. Cunningham, "I guess [Mr.] Brooks could."[16]

Shortly after asking Mr. Goodwin about his retirement plans, Mr. Cunningham "made a Power[P]oint presentation in a meeting with the [Senior Leadership Team] members as well as David Goodling, Senior Vice President of NIBCO[,] in attendance."[17]  David Goodling was Mr. Cunningham's direct boss.[18]  A PowerPoint slide showed an organizational chart that highlighted expected dates of retirement for certain managers.[19]  The chart showed that Mr. Goodwin was expected to retire within five years.[20]

In May 2016, Mr. Goodling expressed concerns to Mr. Cunningham that Mr. Goodwin was "not taking ownership over" accident investigations.[21]  Mr. Cunningham, on behalf of Mr.

---

[13]  Pl.'s Answer to Interrogatories (Doc. 48-6) at 15.  Mr. Cunningham also asked two other NIBCO employees about their retirement plans.  *See id.* (stating that Mr. Cunningham asked Mark Lampe when he planned on retiring); Pankey Decl. (Doc. 48-3) ¶ 6 (stating that Mr. Cunningham asked Ms. Pankey about her retirement plans in early 2017).  Mr. Cunningham says that, pursuant to a "strategic effort to encourage succession planning across the organization," he "spoke with members of the Senior Leadership Team . . . regarding their estimated retirement dates."  Cunningham Decl. (Doc. 48-1) ¶ 6.  Mr. Cunningham asserts that this occurred in early 2017.  *Id.*  But that disputed fact must be resolved in favor of Plaintiff on the summary judgment motion.

[14]  Pl.'s Answer to Interrogatories (Doc. 48-6) at 15.

[15]  *Id.*  Rob Brooks was around 46 years old at this time.  *See* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 34 (listing Rob Brooks' current age at 51 as of January 15, 2021).

[16]  Pl.'s. Answer to Interrogatories (Doc. 48-6) at 15.

[17]  *Id.*

[18]  Cunningham Decl. (Doc. 48-1) ¶ 8.

[19]  Pl.'s Answer to Interrogatories (Doc. 48-6) at 15; *see also* Cunningham Decl. (Doc. 48-1) ¶ 6 (stating that Mr. Cunningham made the PowerPoint presentation around February 28, 2017); Ex. C to Cunningham Decl. (Doc. 48-2) at 8 (organizational chart showing that fifteen NIBCO employees would be retiring within 5 years).

[20]  Pl.'s Answer to Interrogatories (Doc. 48-6) at 15; Ex. C to Cunningham Decl. (Doc. 48-2) at 8.

[21]  Ex. E to Cunningham Decl. (Doc. 48-2) at 14.

Goodling, went to Mr. Goodwin's office and asked Mr. Goodwin if he "was still capable of performing accident investigations now."[22]  Mr. Goodwin responded by asking if the question related to Mr. Goodwin's age.[23]  Mr. Cunningham did not respond.[24]  Instead, Mr. Cunningham asked Mr. Goodwin if Mr. Goodwin was getting other people to perform the accident reports for Mr. Goodwin.[25]  Mr. Goodwin responded by asking Mr. Cunningham if this question referred to Mr. Goodwin's age.[26]  Mr. Cunningham again did not respond to that question.  Mr. Cunningham did tell Mr. Goodwin to email his responses regarding the accident-investigation questions to Mr. Cunningham "so that [Mr. Cunningham] could send [them] on to David Goodling."[27]  That is all the record reveals about this in-person interaction.

The rest of 2016 seems uneventful from the record.  Mr. Goodwin's job title did change from Compliance Manager to Compliance Coordinator in the middle of 2016.[28]  But Mr. Goodwin testified that this change in title did not result in any change to his responsibilities, pay, or salary level.[29]  In January 2017, Mr. Goodwin became responsible for product certifications.[30]  So, at this point, Mr. Goodwin's responsibilities "included: (a) managing safety, quality, and environmental activities to ensure compliance with state, federal, and plant requirements; (b) ensuring the needs

---

[22] Pl.'s Answer to Interrogatories (Doc. 48-6) at 16; *see also* Cunningham Decl. (Doc. 48-1) ¶ 8 (stating that Mr. Goodling's questions to Mr. Cunningham led Mr. Cunningham to ask Mr. Goodwin questions related to accident reports); Goodwin Depo. (Doc. 48-5) 125:7–19.

[23] Pl.'s. Answer to Interrogatories (Doc. 48-6) at 16.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *See* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 4 (stating that Mr. Goodwin's job title was manager prior to mid-2016); Ex. B to Cunningham Decl. (Doc. 48-2) at 5 (showing that on July 12, 2016, Mr. Cunningham commissioned new business cards for Mr. Goodwin that denoted his title as Compliance Coordinator).  NIBCO presents evidence that Mr. Goodwin's position changed to Compliance Coordinator in July 2000.  Ex. B to Pankey Decl. (Doc. 48-3) at 30.

[29] Goodwin Depo. (Doc. 48-5) at 72:23–73:13.

[30] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 5.

of external and internal customers were met on time and accurately; and (c) generating product certifications for third party customers."[31]

### B. *Mr. Goodwin Requests a Promotion*

In April 2017, Mr. Goodwin sought a salary level increase.[32]   NIBCO uses a salary schedule, "which is determined by the level [an employee] is assigned."[33]   This "level determines the rate of salary increases, the amount of annual increases, and bonuses received."[34]   On April 20, 2017, Mr. Goodwin "requested an increase from Level 4 to Level 5."[35]   On April 25, 2017, Mr. Cunningham informed Mr. Goodwin that a "bachelor's degree was required to increase his salary level from Level 4 to Level 5."[36]   Mr. Goodwin does not have a bachelor's degree.[37]   After learning that he was ineligible for a level increase, Mr. Goodwin indicated that he was going to resign.[38]   Mr. Goodwin later rescinded his intended resignation.[39]

At the time, Mr. Goodwin believed Mr. Cunningham when Mr. Cunningham said that such a degree requirement existed.[40]   Now, however, Mr. Goodwin generally denies that a bachelor's

---

[31]   *Id.*; Ex. A to Cunningham Decl. (Doc. 48-2) at 2.

[32]   Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 8.

[33]   *Id.* ¶ 7.

[34]   *Id.*

[35]   *Id.* ¶ 8; Cunningham Decl. (Doc. 48-1) ¶ 9.   Mr. Goodwin initially told Mr. Cunningham that Mr. Goodwin intended to go directly to David Goodling, Mr. Cunningham's boss, to request a salary level increase.   Ex. F to Cunningham Decl. (Doc. 48-2) at 17.   NIBCO suggests that Mr. Goodwin's intention to go outside the chain of command to request the salary level increase was inappropriate.   Cunningham Decl. (Doc. 48-1) ¶ 9.

[36]   Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 11; Cunningham Decl. (Doc. 48-1) ¶ 11; *see also* Ex. D to Pankey Decl. (Doc. 48-3) at 36.

[37]   *See* Ex. V to Cunningham Decl. (Doc. 48-2) at 98.

[38]   Pl.'s Answer to Interrogatories (Doc. 48-6) at 17–18; Goodwin Depo. (Doc. 48-5) at 135:14–16; *see also* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 12 (admitting that Mr. Goodwin "stated that he would be submitting his written resignation").

[39]   Goodwin Depo. (Doc. 48-5) at 135:19–21.

[40]   *Id.* at 88:6–9.   Mr. Goodwin likely knew about the degree requirement before his 2017 request.   *See* Ex. B to DeVous Decl. (Doc. 48-4) at 9 (memorandum from 2013 indicating that NIBCO told Mr. Goodwin that if "he wants to move to a higher level in the company[,] he should strive to complete his degree . . ."); *see also* Ex. D to

degree is required for such an increase.[41]  Mr. Goodwin states that Micha Pankey, John Duclos, Rob Brooks, and Danny Yarborough all received level increases "without having college degrees."[42]  Ms. Pankey indicates that she has a bachelor's degree.[43]  Mr. Duclos, a Level 5, and Mr. Brooks, a Level 4, do not have bachelor's degrees.[44]  According to NIBCO, "a bachelor's degree is generally required for Level 4 employees and above."[45]  There are some times, however, where a Level 4 (like Mr. Goodwin) "may not require a bachelor's degree, but it is preferred."[46]  Nevertheless, there are Level 5 employees who do not have a college degree.[47]  NIBCO explains that these instances are "rare and unique circumstances."[48]  For instance, one such Level 5 "has unique and specialized knowledge of [NIBCO's] industry and demonstrates superior performance in the execution of his role."[49]

In the aftermath of not raising Mr. Goodwin to a Level 5, Mr. Cunningham asked Mr. Goodwin what else could be done to keep Mr. Goodwin at NIBCO.[50]  Mr. Goodwin asked for a 6% salary increase.[51]  Mr. Cunningham "look[ed] into a pay increase for [Mr.] Goodwin and

---

Cunningham Decl. (Doc. 48-2) at 12 (Mr. Goodwin mentioning the degree requirement).

[41]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 10.

[42]  *Id.*

[43]  Pankey Decl. (Doc. 48-3) ¶ 3.

[44]  *Id.* ¶ 20; *see* Ex. D to Cunningham Decl. (Doc. 48-2) at 12 (stating that NIBCO's degree requirement may prevent Mr. Brooks from succeeding Mr. Goodwin).

[45]  DeVous Decl. (Doc. 48-4) ¶ 6.

[46]  *Id.*

[47]  *Id.* ¶ 8.

[48]  *Id.*

[49]  *Id.*

[50]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 13.  NIBCO asserts that this conversation occurred on April 26, 2017 (the day after denying Mr. Goodwin an increase to Level 5).  Statement of Facts (Doc. 50) ¶ 13.  Mr. Goodwin asserts in his Response to NIBCO's Statement of Undisputed Material Facts that the discussion occurred on May 29, 2017.  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 13.  But in his response to NIBCO's interrogatories, Mr. Goodwin states that this conversation occurred in April 2017.  Pl.'s Answer to Interrogatories (Doc. 48-6) at 17–18.

[51]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 13.

reached out to human resources to see if [Mr.] Goodwin could qualify for the requested raise within the Level 4 range."[52]   NIBCO's human resources department conducted a market review and concluded that "[Mr.] Goodwin's salary was well-positioned both internally and externally."[53]   On June 7, 2017, Mr. Cunningham learned that he had the discretion, depending on NIBCO's needs, to increase Mr. Goodwin's salary by $2,000 to $3,000.[54]

Mr. Cunningham asked Mr. Goodwin to "provide written support for an increase and to identify recent accomplishments."[55]   Specifically, Mr. Cunningham directed Mr. Goodwin to "provide a list of training courses, seminars, or any certificates he had taken or received."[56]   On June 28, 2017, Mr. Goodwin responded by email, chronicling his entire time at NIBCO.[57]   Mr. Cunningham then asked Mr. Goodwin to "add information about [his] recent accomplishments, . . . focus[ing] on the last 2 years."[58]   Mr. Goodwin said, "really there are no 'stand out' accomplishments, other than my jumping in where needed."[59]   Mr. Goodwin also said that he helped out in other areas of the facility due to a manpower shortage, "which caused [him] to get behind on [his] Safety procedures edits and a lot of [his] other work."[60]   Finally, Mr. Goodwin indicated he had been "playing catch-up" and that "[t]he only new addition to [his] job has been

---

[52]   *Id.* ¶ 14.

[53]   *Id.* ¶ 15.

[54]   Ex. G to Pankey Decl. (Doc. 48-3) at 46.

[55]   Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 16.

[56]   *Id.*

[57]   Ex. I to Cunningham Decl. (Doc. 48-2) at 23–24.

[58]   *Id.* at 23.

[59]   *Id.*

[60]   *Id.*

3rd party inspections and [certifications] for ARAMCO . . . ."[61]  Mr. Goodwin did not get the salary increase.[62]

## C. *Run-up to Mr. Goodwin's Termination*

In May 2017, Mr. Cunningham and Mr. Goodling conducted a "mid-year review of Mr. Goodwin's performance."[63]  NIBCO says that the review concerned his progress on eight goals.[64]  Mr. Goodwin self-reported that he was "on track" for six of the goals and behind on two goals.[65]  NIBCO claims that Mr. Cunningham later learned that Mr. Goodwin "was not making the progress he professed."[66]

On June 20, 2017, an ARAMCO representative emailed NIBCO employees, including Mr. Goodwin, to ask "Why is Nibco submitting certificates that show manufacturing and test dates in

---

[61] *Id.*

[62] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 21.  NIBCO says that it denied the increase based on "Mr. Goodwin's admitted lack of 'stand out' accomplishments . . . ."  Statement of Facts (Doc. 50) ¶ 21.  NIBCO also said Mr. Goodwin's decision not to participate in available training and his receipt of a 3.25% annual raise factored into the decision.  *Id.*  Mr. Goodwin denies this, contending that NIBCO's reasons are pretext "for the true reason that [Mr.] Cunningham wanted [Mr. Goodwin] to retire or leave the company."  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 21.  Mr. Goodwin does say that he received a 3% increase subsequent to an employment evaluation that was conducted in May or June 2017.  *Id.* ¶ 9; *see also* Pl.'s Answer to Interrogatories (Doc. 48-6) at 18 (stating that Mr. Goodwin received a 3% salary increase).

[63] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 22.

[64] Statement of Facts (Doc. 50) ¶ 23.  There is a dispute as to which goals were set by Mr. Cunningham and which were set by Mr. Goodwin.  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 23.

[65] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 24.  In his Response to NIBCO's Statement of Undisputed Material Facts, Mr. Goodwin denies that he self-reported his status on these goals.  *Id.*  But he points to nothing in the record to support his denial.  His denial is entirely conclusory and therefore not a denial at all.

Mr. Goodwin takes issue with receiving negative ratings for goals that "were applicable to every salaried employee."  *Id.* ¶ 23.  For instance, the review indicated that Mr. Goodwin was behind on a goal to achieve a "[Total Case Incident Rate] of 2.72."  Ex. K to Cunningham Decl. (Doc. 48-2) at 34.  Mr. Goodwin says such rates are desirable but the ability to do so is not within the control of any one person.  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 23.  According to Mr. Goodwin, accidents happen.  *Id.*  Mr. Goodwin also says that an incident rate of 2.72 for the Blytheville plant is "absurd" given that previous years showed a rate of 4.53 for 2016 and a rate of 6.03 for 2017.  *Id.*

[66] *Id.* ¶ 26.  Mr. Goodwin's denial in his Response to NIBCO's Statement of Undisputed Material Facts is a non-sequitur and unsupported.  It is no denial at all.

the future?"[67]   Mr. Goodwin apologetically responded to this email, saying that "this was my mistake."[68]   Mr. Goodwin explained that he knew why it happened and "fully underst[oo]d" why ARAMCO was so concerned.[69]   In response, the ARAMCO representative conceded that mistakes happen and said that Mr. Goodwin was "missing the point."[70]   The representative pointed out that "[t]he issue of Nibco employing disingenuous certification practices has been a chronic problem over the years."[71]

On June 23, 2017, Mr. Cunningham emailed Mr. Goodwin and Derek Oldsen, the Engineering Manager, at 8:15 a.m. to express his concern about the ARAMCO situation and to schedule a meeting for 9:00 a.m. that same day.[72]   At 10:13 a.m., Mr. Cunningham emailed Mr. Goodwin to ask Mr. Goodwin where he was.[73]   Mr. Goodwin arrived late to the meeting because he was on the plant floor and did not see the 8:15 a.m. email to him.[74]

Around July 2017, Mr. "Cunningham asked [Mr.] Goodwin to begin leading monthly team quality and safety meetings."[75]   The first meeting was set for July 5, 2017.[76]   Mr. Goodwin "followed [Mr.] Cunningham's directions and prepared an agenda for the meeting and notified his

---

[67]   Ex. L to Cunningham Decl. (Doc. 48-2) at 46.

[68]   *Id.*

[69]   *Id.*

[70]   *Id.* at 45.

[71]   *Id.*  In its moving papers, NIBCO implies that Mr. Goodwin's mistake led ARAMCO to suggest that NIBCO was engaging in "disingenuous certification practices."  *See* Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 4. In context, this email chastises NIBCO's history of such practices and not the isolated incident involving Mr. Goodwin.  At least a rational juror could think so.

[72]   Ex. L to Cunningham Decl. (Doc. 48-2) at 43.

[73]   *Id*.

[74]   Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 29.

[75]   *Id.* ¶ 30.

[76]   *Id.* ¶ 31.

team member[s] to attend."[77]   Mr. Goodwin was ill when he woke up on July 5, 2017.[78]   Mr. Goodwin "attempted to email [Mr.] Cunningham, the H.R. manager, and his assistant, Rob Brooks[,] to let the[m] know that he needed paid time off (PTO)."[79]   None of the addressees received the email because Mr. Goodwin sent the email to the wrong email addresses.[80]   Mr. Goodwin did not attend the meeting.[81]

On July 7, 2017, Mr. Cunningham and Micha Pankey, a HR representative, met with Mr. Goodwin "to discuss concerns about [Mr. Goodwin's] lack of leadership and unprofessional behavior."[82]   Mr. Cunningham "notified [Mr.] Goodwin that he was expected to (a) plan and conduct the monthly department meetings, (b) provide appropriate notice for paid time off, and (c) discuss concerns directly with [Mr.] Cunningham prior to involving human resources."[83]   Mr. Goodwin refused to sign a counseling document and "again tendered [a] verbal notice of resignation."[84]   On July 14, 2017, Mr. Goodwin informed Ms. Pankey that he had "decided to go ahead and not retire at this time."[85]   (For those keeping score at home, that makes two times in 2017 that Mr. Goodwin said he intended to resign and walked that intention back.[86])

---

[77]   *Id.*

[78]   *Id.* ¶ 32.

[79]   *Id.*

[80]   *Id.* ¶¶ 33–34.

[81]   *Id.* ¶ 32.

[82]   *Id.* ¶ 35.   Mr. Goodwin contends that the meeting took place on July 7, 2017.  *Id.*  The counseling form, which Mr. Goodwin did not sign, presents July 7 and July 10 as possible dates.  Ex. J to Pankey Decl. (Doc. 48-3) at 81.  For summary judgment purposes, the meeting took place on July 7, 2017.

[83]   Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 36.

[84]   *Id.*; *see also* Goodwin Depo. (Doc. 48-5) at 162:2–8.

[85]   Ex. L to Pankey Decl. (Doc. 48-3) at 87.

[86]   When Ms. Pankey learned from Mr. Goodwin that Mr. Goodwin would not be retiring this second time, Ms. Pankey asked Ms. DeVous whether NIBCO could accept Mr. Goodwin's verbal resignation.  Ex. 12 to Pl.'s Decl. of Authenticity (Doc. 63-1) at 63.  Ms. Pankey said, "this is the 2nd time [Mr. Goodwin] has done this and his actions have definitely affected the trust and confidence that Jeff Cunningham has in him, especially as a member of our [Senior Leadership Team]."  *Id.*  Ms. DeVous told Ms. Pankey that "[t]his looks like a performance issue to me.  I wouldn't recommend accepting his verbal resignation especially since you have a written withdrawal of retirement

10

On July 17, 2017, Mr. Cunningham told Mr. Goodwin that Mr. Cunningham was planning on assigning Mr. Goodwin's office to a member of the purchasing department.[87]  Mr. Cunningham directed Mr. Goodwin to pack his office before Mr. Goodwin left on a planned vacation.[88]  Mr. Cunningham's stated purpose for the office reassignment was to keep teams centralized.[89]  But Mr. Goodwin contends that Mr. Cunningham's stated purpose for the office change was not the real purpose.[90]

Here are the facts for summary judgment purposes.  Mr. Cunningham sent Mr. Goodwin a letter on the morning of July 17, 2017.[91]  The letter requested that Mr. Goodwin attend a meeting in the conference room.[92]  Only Mr. Goodwin and Mr. Cunningham attended the meeting.[93]  Mr. Cunningham was irate because Mr. Goodwin was not retiring.[94]  Mr. Cunningham said he did not want to work with Mr. Goodwin and "if [Mr. Goodwin] stayed[,] he would not make it, implying that if [Mr. Goodwin] did not quit or retire, [Mr.] Cunningham would find some pretext to fire him or sabotage his ability to get his work done and that a further disciplinary write up would be forthcoming."[95]  Mr. Goodwin says that "[i]mmediately after the meeting, [Mr.] Cunningham sent [Mr.] Goodwin an e-mail that he was reassigning offices . . . ."[96]

---

notice."  *Id.*

[87]  Ex. Q to Cunningham Decl. (Doc. 48-2) at 72.

[88]  *Id.*

[89]  *Id.*

[90]  Pl.'s Answer to Interrogatories (Doc. 48-6) at 19.

[91]  *Id.*

[92]  *Id.*

[93]  *Id.*

[94]  *Id.*

[95]  *Id.*

[96]  *Id.*  A rational juror could not conclude that Mr. Cunningham "immediately" emailed Mr. Goodwin after the meeting to inform Mr. Goodwin of the office reassignment.  This is because Mr. Cunningham's email regarding office reassignment was written in response to an email Mr. Goodwin sent Mr. Cunningham where Mr. Goodwin requested paid time off.  Ex. Q to Cunningham Decl. (Doc. 48-2) at 72.

Between July 17 and July 28, 2017, Mr. Goodwin took paid time off for vacation.[97]  During that time, NIBCO says it learned that Mr. Goodwin did not complete certifications for a customer's order before he left on vacation.[98]  NIBCO's documentary evidence shows an email exchange dated July 18, 2017, indicating that a valve shipment bound for Ecuador had already left the Blytheville plant with generic certifications that did not meet the customer's requirements.[99]  A frustrated Paulo Neto (a NIBCO employee) emailed Derek Oldsen (the NIBCO Engineering Manager) to tell Mr. Oldsen that the order for the valves was placed "almost 2 months ago."[100]  Mr. Neto explained that he gave the "OK" to pack the valves only after checking with Mr. Goodwin.[101]  Mr. Goodwin denies that he failed to provide the proper certifications before taking leave.[102]  His denial is unsupported by any citations to the record.  In any event, the record is crystal clear that NIBCO believed Mr. Goodwin failed to prepare the proper certifications before taking vacation.  No rational juror could conclude otherwise.

During Mr. Goodwin's vacation, his office possessions were moved to the Distribution Center, "which was approximately 600 feet from Mr. Goodwin's previous office . . . ."[103]  In a July 21, 2017 email, Mr. Cunningham told Mr. Goodwin to "[f]eel free to choose any office" in the Distribution Center.[104]  Quite a difference exists between Mr. Goodwin's old office and his new office.[105]  Mr. Goodwin's old office was well appointed, having a large L-shaped desk, carpet,

---

[97]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 39.

[98]  Statement of Facts (Doc. 50) ¶ 40.

[99]  Ex. R to Cunningham Decl. (Doc. 48-2) at 76.

[100]  *Id.*

[101]  *Id.*

[102]  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 40.

[103]  Cunningham Decl. (Doc. 48-1) ¶ 26; *see also* Ex. S to Cunningham Decl. (Doc. 48-2) at 90.

[104]  Ex. S to Cunningham Decl. (Doc. 48-2) at 90.

[105]  *Compare* Ex. 1 to Pl.'s Decl. of Authenticity (Doc. 63-1) at 2, *with id.* at 3–8.  It's worth taking a look at the pictures in the record.

extra chairs, and cabinetry for storage.[106]  Mr. Goodwin's new office had a tile floor that had seen better days.[107]  His desk barely held computer monitors.[108]  The new office was otherwise barren.[109]  Mr. Goodwin did receive a larger desk on August 9, 2017, which Mr. Goodwin appreciated.[110]

On August 2, 2017, Mr. Cunningham held Mr. Goodwin over after a meeting to ask Mr. Goodwin if he was leaving or staying.[111]  After Mr. Goodwin said that he was staying, Mr. Cunningham said "I want you to leave."[112]  Mr. Cunningham told Mr. Goodwin to "get some balls."[113]  Mr. Cunningham then told Mr. Goodwin that if Mr. Goodwin stayed, he would not "make it."[114]

At the one-on-one, Mr. Cunningham also said that he had received two complaints from ARAMCO but refused to tell Mr. Goodwin what the complaints were, stating that Mr. Goodwin knew what the complaints were.[115]  A few weeks later, Mr. Goodwin emailed an ARAMCO representative to ask about any complaints ARAMCO had against Mr. Goodwin.[116]  The representative said, "you know we have complaints regarding Nibco certifications, but I don't associate that personally with you."[117]

---

[106] *Id.* at 2.

[107] *Id.* at 3.

[108] *Id.*

[109] *Id.*

[110] Ex. S to Cunningham Decl. (Doc. 48-2) at 89.

[111] Goodwin Depo. (Doc. 48-5) at 127:4–7.

[112] *Id.* at 127:10–11.

[113] *Id.* at 127:18.

[114] *Id.* at 127:21–22.

[115] *Id.* at 127:12–16.

[116] Ex. 9 to Pl.'s Decl. of Authenticity (Doc. 63-1) at 49.

[117] *Id.*

Also on August 2, 2017 (a Wednesday), Mr. Cunningham told Mr. Goodwin and Chris Burfeind, Mr. Goodwin's subordinate, "that the three of them would begin conducting daily safety inspections" at the plant.[118]  Mr. Cunningham cited a high incident rate of work-place injuries as the impetus for these inspections.[119]  Mr. Cunningham requested that the inspections begin immediately and that Messrs. Goodwin and Burfeind create a report regarding their daily inspections.[120]  On August 4, 2017 (a Friday), Mr. Cunningham followed up with Mr. Goodwin regarding Mr. Goodwin's inspections.[121]  Mr. Goodwin told Mr. Cunningham that Mr. Goodwin "was planning on starting Monday" because he "had some other work to complete."[122]  Mr. Goodwin acknowledged the "the importance" of the inspections and promised to complete them the following week.[123]  Mr. Cunningham responded, "[t]hat is disappointing.  I requested that walk thru's start immediately."[124]

Mr. Goodwin speculates that Mr. Cunningham had a nefarious motive for implementing the daily inspections.[125]  Mr. Goodwin says that this additional assignment "was merely a pretext on [Mr. Cunningham's] part" and was punishment for Mr. Goodwin's refusal "to retire and to further reduce the available time for him to perform his regular duties."[126]  Nothing in the record supports that speculation.  Indeed, in sworn testimony in a different matter,[127] Mr. Goodwin said

---

[118] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 46.

[119] Cunningham Decl. (Doc. 48-1) ¶ 28.

[120] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 48; *see also* Ex. W to Cunningham Decl. (Doc. 48-2) at 101 (explaining that Mr. Cunningham requested that the investigations begin immediately).

[121] Ex. W to Cunningham Decl. (Doc. 48-2) at 101.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 47.

[126] *Id.*

[127] Mr. Goodwin sought and was denied unemployment benefits after his termination.  He appealed the agency determination that he was disqualified from receiving benefits.  Ex. 26 to Pl.'s Decl. of Authenticity (Doc. 63-3)

that these daily inspections revealed issues that he would not have detected absent the inspections.[128]

On August 3, 2017, Mr. Cunningham and Ms. Pankey again met with Mr. Goodwin.[129] NIBCO documented this meeting on a disciplinary form.[130] The form indicates that Mr. Goodwin received a "First Written Warning."[131]  Mr. Cunningham wrote that Mr. Goodwin's conduct at the last counseling session (July 7, 2021) failed to demonstrate Mr. Goodwin's willingness "to accept responsibility for his unprofessional and poor leadership actions as described in [Mr. Goodwin's] 7-7-17 documented counseling session report."[132]  Mr. Cunningham wrote that Mr. Goodwin's conduct raised "concerns about [Mr. Goodwin's] ability to be an effective leader/manager."[133] These concerns, Mr. Cunningham said, led to Mr. Cunningham's decision to remove Mr. Goodwin from the Senior Leadership Team.[134]  Mr. Cunningham wrote that Mr. Goodwin needed "immediate improvement in his leadership and teamwork skills . . . ."[135]  To that end, Mr. Cunningham prescribed additional training and required Mr. Goodwin "to enroll in an approved leadership course in the next 30 days."[136]  Mr. Goodwin refused to sign the warning, contending that "the first half of the write up [was] not accurate."[137]

---

at 6.  This appeal was lodged with an administrative law judge for the Arkansas Appeal Tribunal.

[128] *Id.* at 70.

[129] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 43; *see also* Ex. T to Cunningham Decl. (Doc. 48-2) at 92.

[130] Ex. T to Cunningham Decl. (Doc. 48-2) at 92.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

[136] *Id.*; *see also* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 45.

[137] Ex. T to Cunningham Decl. (Doc. 48-2) at 93.

After this meeting, but on the same day (August 3, 2017), Mr. Goodwin sent a formal discrimination complaint to Ms. Pankey.[138]  The complaint chronicled nearly all of Mr. Goodwin's conflicts with Mr. Cunningham:

> For approximately one year, [Mr. Cunningham] has been engaged in a series of actions that constitute age discrimination . . . .  Specifically, [Mr. Cunningham] has refused to increase my management level, taken responsibilities away from me, made unfounded accusations against me, taken away my office and moved me to a work station that does not accommodate my work needs in order to accommodate a younger employee, routinely pushed me to go ahead and retire, taken away my job duties and assigned them to a younger person, questioned whether I was still capable of doing my job (referencing my age), belittled me, unnecessarily increased my job duties, assigned nefarious motives to an honest mistake (emailing him with the wrong email address), accused me of a bad attitude without providing specific actions to support these claims (even when asked), and today he took the grand master key from me and removed me from the leadership team.[139]

Mr. Goodwin also referenced NIBCO's policy of requiring a college degree for a Level 5 promotion, arguing that such a policy has a disparate impact on older employees such as Mr. Goodwin.[140]

Around August 9, 2017, Mr. Cunningham learned that a "high number of associates [were] out of compliance, for an extended period of time, on their respirator fit test."[141]  Mr. Cunningham relayed his concern about this issue to Mr. Goodwin, saying that "[t]his testing must be completed every 12 months."[142]  Mr. Cunningham directed Mr. Goodwin "to develop a plan to have everyone

---

[138] Pl.'s Resp. Statement of Facts (Doc. 64) ¶ 51.  The formal complaint references Mr. Goodwin's removal from the Senior Leadership Team, thus a rational juror could only conclude that the formal complaint came after the meeting.  *See* Ex. P (Formal Complaint) to Pankey Decl. (Doc. 48-3) at 99 (stating that Mr. Cunningham removed Mr. Goodwin from the leadership team); Pankey Decl. (Doc. 48-3) ¶¶ 14–15.

[139] *Id.*

[140] *Id.*  On September 5, 2017, Mary DeVous, a NIBCO corporate human resources employee, responded to this complaint.  Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 52.  DeVous concluded that Mr. Goodwin's allegations against Mr. Cunningham were unsubstantiated.  *Id.*; *see also* Ex. F to DeVous Decl. (Doc. 48-4) at 28–29.

[141] Ex. Y to Cunningham Decl. (Doc. 48-2) at 112; *see also* Goodwin Depo. (Doc. 48-5) 248:6–12 (discussing out-of-compliance respirator testing).

[142] Ex. Y to Cunningham Decl. (Doc. 48-2) at 112.

fit tested by the end of next week at the latest" and to explain "how this was allowed to happen."[143]

On August 14, 2017, Mr. Cunningham expressed concern with the fit-test schedule Mr. Goodwin

sent to Mr. Cunningham.[144]  Mr. Cunningham questioned why, after he had directed Mr. Goodwin

to have testing completed by August 18, 2017, Mr. Goodwin's fit-test schedule included dates at

the end of August.[145]  Mr. Cunningham reiterated the urgent nature of the testing.[146]  Mr. Goodwin

said to Mr. Cunningham, "it will be completed as you direct."[147]

Around this same time, Mr. Cunningham raised concerns with Mr. Goodwin related to out-

of-date training for numerous NIBCO employees.[148]  Mr. Cunningham told Mr. Goodwin to

"develop a spreadsheet showing the status of employee compliance with certain safety, health and

environmental training requirements and a schedule for getting caught up."[149]  On August 24,

2017, Mr. Cunningham emailed Mr. Goodwin to say that "[o]bviously[,] too much training is out

of date."[150]  Mr. Cunningham also said that Mr. Goodwin needed to prioritize the trainings and

that the dates on the spreadsheet were too far out.[151]  In response, Mr. Goodwin emailed Mr.

Burfeind and another NIBCO associate to develop a plan to get training "back on track."[152]  Mr.

Goodwin stated that the training "all appears to have been missed in 2016."[153]

---

[143] *Id.*  In a follow-up email, Mr. Cunningham emphasized that the fit testing "require[d] extreme urgency." *Id.*

[144] *Id.* at 117.

[145] *Id.*

[146] *Id.*

[147] *Id.*

[148] *Id.* at 112.

[149] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 55.  Mr. Goodwin does not deny that Mr. Cunningham made this request and instead asserts that the scope of the request took Mr. Goodwin away from his regular duties. *Id.*

[150] Ex. Y to Cunningham Decl. (Doc. 48-2) at 128.

[151] *Id.*

[152] *Id.*

[153] *Id.*  In the email, Mr. Goodwin assumes that a four-month span between the departure of a safety coordinator and Mr. Burfeind's assignment to that role caused the lapse. *Id.*  It was at this time, Mr. Goodwin wrote, that Mr. Goodwin was responsible for "the environmental, safety and first aid along with my duties." *Id.*  NIBCO also

At about this same time, Mr. Cunningham asked Mr. Goodwin to attend twice monthly Safety Committee meetings.[154]  On August 14, 2017, Mr. Cunningham told Mr. Goodwin that "it is good practice for you to be a part of this meeting.  It will help you to understand firsthand how Chris [Burfeind] and the Safety [C]ommittee are working through safety concerns."[155]   Mr. Goodwin did not attend these meetings, believing that his presence "would stifle the free exchange of ideas among the members."[156]  Mr. Goodwin also says that Mr. Cunningham only recommended that Mr. Goodwin attend the meetings.[157]

Another certification issue arose near the end of August 2017.  NIBCO says that Derek Oldsen informed Mr. Cunningham that Mr. Goodwin "had not provided certifications for certain valves to an inspector in a timely manner . . . ."[158]  Mr. Goodwin denies that he was supposed to issue the certifications NIBCO references on the date requested.[159]   Documentary evidence suggests that an inspector claims to have not received certifications "as promised."[160]  It is not clear whether Mr. Goodwin or NIBCO is correct as to whether Mr. Goodwin did anything wrong here.  What is clear, however, is that NIBCO got a complaint about Mr. Goodwin and believed Mr. Goodwin was at fault.

---

asserts that Mr. Goodwin "failed to ensure that his subordinate, Mr. Brooks, had the proper environmental health and safety training for more than one year after the environmental coordinator responsibilities were assigned to him . . . ." Cunningham Decl. (Doc. 48-1) ¶ 29.  NIBCO says that Mr. Goodwin failed to "control and store the Spill Prevention Control and Countermeasure (SPCC) manual." *Id.*  NIBCO also presents evidence that "Mr. Goodwin allowed annual air monitoring to lapse for an extended period of time . . . ." *Id.*

[154] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 58.

[155] Ex. Z to Cunningham Decl. (Doc. 48-2) at 139.

[156] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 58.

[157] *Id.*

[158] Statement of Facts (Doc. 50) ¶ 60.

[159] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 60.  It is questionable that Mr. Goodwin properly denies this assertion.  Mr. Goodwin does not point to record evidence to support his denial.  *See id.*  Instead, Mr. Goodwin states that he was not required to provide an inspector certification the day of an inspection and that "inspectors are generally agreeable to receiving the [certification] within a few days or a week following the inspection."  *Id.*

[160] Ex. AA to Cunningham Decl. (Doc. 48-2) at 147.

On September 13, 2017, Mr. Cunningham emailed Mr. Goodwin to explain the remedial leadership training flowing from Mr. Goodwin's First Written Warning.[161]  Mr. Cunningham assigned two books for Mr. Goodwin to read: (1) *The 21 Irrefutable Laws of Leadership*, and (2) *The 21 Indispensable Qualities of a Leader*.[162]  Mr. Cunningham directed Mr. Goodwin to read the first book and complete all chapter assignments during the next six weeks, with all assignments due on October 30, 2017.[163]  Mr. Goodwin was directed to submit completed assignments weekly.[164]  Mr. Cunningham tasked Mr. Goodwin with reading the second book over the following six weeks.[165]  For this book, Mr. Goodwin was supposed to turn in a one page summary of each chapter on a weekly basis.[166]  The deadline for this assignment was November 15, 2017.[167]

Mr. Goodwin's first assignment was "expected" on September 22, 2017, but was not received until October 3, 2017.[168]  In the instant litigation, Mr. Goodwin denies that he was late, relying on the September 11, 2017 email to say that the only deadlines he had were the completion dates for the assignments for each book.[169]  But in sworn testimony in another matter, Mr. Goodwin admitted that he was two weeks late in starting his assignments.[170]  Mr. Goodwin also failed to complete all assignments before the November 15, 2017 deadline.[171]

---

[161] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 61.  Mr. Goodwin had requested information related to an approved leadership class on August 9, 2017.  Ex. BB to Cunningham Decl. (Doc. 48-2) at 160.

[162] Ex. BB to Cunningham Decl. (Doc. 48-2) at 159.

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] Statement of Facts (Doc. 50) ¶ 64.

[169] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 64.

[170] Ex. 32 to Pl.'s Decl. of Authenticity (Doc. 63-3) at 44–45.

[171] Ex. BB to Cunningham Decl. (Doc. 48-2) at 175–182 (showing that Mr. Goodwin submitted chapter assignments between November 17 and November 30, 2017).

Mr. Goodwin handwrote his responses to the chapter assignments.[172]   Many of Mr. Goodwin's responses said that his answers were personal between himself and the author.[173]   Mr. Cunningham says that Mr. Goodwin's responses were vague, "lacked professionalism (handwritten on notebook paper)[,] and showed little effort."[174]   Mr. Goodwin denies that his responses were vague.[175]   Mr. Goodwin also asserts that Mr. Cunningham testified in another matter that Mr. Cunningham did not review any "submission[s] until [Mr.] Goodwin had completed all the assignment[s] and [Mr. Cunningham] had determined to terminate [Mr. Goodwin]."[176]   The record supports Mr. Goodwin's proposition that Mr. Cunningham did not review the assignments until they were all completed.[177]

On September 18, 2017 (a Monday), Mr. Cunningham asked Mr. Goodwin "to complete or provide a status on five specific tasks, most of which related to safety and compliance, by September 22, 2017."[178]   On September 22, 2017 (a Friday), Mr. Goodwin emailed Mr. Cunningham to say that Mr. Goodwin and his team were still gathering information for Mr. Cunningham's September 18 request but that the information would not be available by Monday.[179]   On the same day, Mr. Cunningham told Mr. Goodwin, "I want an individual status

---

[172] *See, e.g.*, Ex. CC to Cunningham Decl. (Doc. 48-2) at 163.

[173] *See id.* at 166 (stating that the questions were personal and intended to be between the author and the reader); *id.* at 168 (stating that the questions "are to be considered by the reader as self-help"); *id.* at 170 (stating that the "answers are personal and will not be shared").

[174] Cunningham Decl. (Doc. 48-1) ¶ 31.

[175] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 65.

[176] *Id.* ¶ 66.

[177] *See* Ex. 32 to Pl.'s Decl. of Authenticity (Doc. 63-3) at 38:6–7 (Mr. Cunningham stating that he did not grade the assignments until the end of the assignments).   A rational juror could conclude that Mr. Cunningham seriously contemplated terminating Mr. Goodwin on November 17, 2017, nearly two weeks before all of the assignments were submitted.   Ex. 23 to Pl.'s Decl. of Authenticity (63-2) at 2; *see supra* note 171 (discussing chapter assignments submitted after November 17, 2017)

[178] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 67; Ex. DD to Cunningham Decl. (Doc. 48-2) at 187–88.

[179] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 68; Ex. DD to Cunningham Decl. (Doc. 48-2) at 187.

of each item on the list today."[180]   Mr. Cunningham also "identified specific deadlines for each item."[181]   Mr. Goodwin did not provide any of the requested information on September 22, 2017.[182]

Also on September 18, 2017, Mr. Goodwin fell while attempting to cross a drainage ditch.[183]   Mr. Goodwin suffered an injury to his knee.[184]   Mr. Goodwin immediately sought medical treatment.[185]   Mr. Goodwin sprained his right knee, and a doctor prescribed a knee brace for Mr. Goodwin.[186]   Mr. Goodwin was also given "restrictions of limited standing and walking until complete healing had taken place."[187]

In response to this accident, Mr. Cunningham asked, "[w]hy did [Mr. Goodwin] step over the ditch instead of going around the ditch?"[188]   Mr. Cunningham also said that some of Mr. Goodwin's suggested corrective actions were "unreasonable" and that being "more aware of where you are stepping while walking thru this area is probably more appropriate."[189]   Mr. Cunningham, Mr. Goodwin, and other NIBCO employees visited the site of the accident on September 25, 2017.[190]   At this visit, the decision was made to place a sign saying "danger do not cross ditch."[191]

---

[180] Ex. DD to Cunningham Decl. (Doc. 48-2) at 187; *see also* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 68.

[181] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 68.

[182] *Id.* ¶ 69.

[183] Ex. 28 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 33–37; *see also* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 67 (stating that Mr. Goodwin injured his knee on September 18, 2017).

[184] Ex. 28 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 37.

[185] *Id.*

[186] *Id.* at 35, 37.

[187] *Id.*

[188] *Id.* at 42; *see also id.* at 40 (suggesting corrective actions).

[189] *Id.*

[190] Pl.'s Answer to Interrogatories (Doc. 48-6) at 23.

[191] *Id.*

Mr. Cunningham asked Mr. Goodwin "if you walked up here could you read the sign and know not to cross the ditch?"[192]  Mr. Goodwin said he could.[193]

On October 9, 2017, Mr. Cunningham asked Mr. Goodwin to coordinate with Mr. Goodwin's team and Engineering to provide information to a NIBCO product manager regarding valves for a NIBCO customer, Valero.[194]  Mr. Goodwin did not consult with Engineering and instead provided the information directly to the product manager.[195]  Mr. Goodwin acknowledged that he should not have sent the information to the product manager without first consulting Engineering.[196]

On October 16, 2017, Mr. Cunningham told Mr. Goodwin that there were concerns with the information Mr. Goodwin sent to the product manager.[197]  Mr. Cunningham directed Mr. Goodwin to consult with Engineering and to let Mr. Cunningham know when the issue was resolved.[198]  Over two months later, Mr. Cunningham emailed Mr. Goodwin and said that Mr. Goodwin never indicated that the issue was resolved and that Mr. Goodwin never contacted Engineering.[199]  The record suggests that Mr. Goodwin did contact Engineering on October 17, 2017, and that Engineering sent Mr. Goodwin and Mr. Cunningham an edited version of the requested information on October 20, 2015.[200]  Nevertheless, Mr. Goodwin admitted that he did

---

[192] *Id.*

[193] *Id.*

[194] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 78.; Ex. HH to Cunningham Decl. (Doc. 48-2) at 241.

[195] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 79.

[196] *Id.* ¶ 82; *see also* Ex. 31 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 75 (Mr. Goodwin stating that Mr. Cunningham was correct and that "I was in error for sending the form to [the product manager] before [Engineering] finished and don't know why I sent it before he finished his review").

[197] Ex. HH to Cunningham Decl. (Doc. 48-2) at 240.

[198] *Id.*; Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 81.

[199] Ex. HH to Cunningham Decl. (Doc. 48-2) at 240; Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 84.

[200] *See* Ex. 31 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 79 (Mr. Goodwin emailing Mr. Oldsen requesting comments on the requested information); *id.* (Mr. Oldsen attaching an "edited copy of the Valero AML to send back to" the

not follow up with the product manager or with Mr. Cunningham to let Mr. Cunningham "know the concerns were 'cleared up.'"[201]

On October 13, 2017, Mr. Cunningham asked Mr. Goodwin for information about the "certification process to help identify ways to make the process more efficient."[202]  On November 14, 2017 (a Tuesday), Mr. Cunningham requested a status update on this request.[203]   Mr. Cunningham specifically requested information pertinent to ARAMCO "by the end of the week."[204]  Mr. Goodwin agreed to provide the requested information.[205]  Mr. Goodwin did not do so.[206]  The following Monday, Mr. Goodwin sent Mr. Cunningham a flow chart illustrating the ARAMCO certification process.[207]   Mr. Goodwin titled the chart, "How to Tie Shoes."[208]   Mr. Cunningham thought the title showed a lack of attention to detail, which was evidence of Mr. Goodwin's "lack of commitment to improving."[209]  Mr. Goodwin says that "it was understood that [the flow chart] was a draft and he was seeking [Mr. Cunningham's] approval of the format and would revise once approved."[210]   Mr. Goodwin presents no evidence of this supposed understanding, and the Court has found none in the record.

---

product manager).

[201] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 84.

[202] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 70; Ex. FF to Cunningham Decl. (Doc. 48-2) at 233.

[203] Ex. FF to Cunningham Decl. (Doc. 48-2) at 232.

[204] *Id.*

[205] *Id.*

[206] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 72.

[207] *Id.* ¶ 73.

[208] *Id.*; Ex. FF to Cunningham Decl. (Doc. 48-2) at 230.

[209] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 74; Cunningham Decl. (Doc. 48-1) ¶ 35.

[210] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 73.

On November 6, 2017, Mr. Goodwin filed a formal discrimination charge with the Equal Employment Opportunity Commission ("EEOC").[211]  Mr. Goodwin listed August 1, 2017 through September 5, 2017 as the dates of discrimination.[212]  In the formal charge, Mr. Goodwin alleged that, "[i]n early August 2017, I was subjected to disparaging comments because of my age (60)."[213]  Mr. Goodwin said he filed an internal discrimination complaint on August 3, 2017 and received a written warning on the same day.[214]  Mr. Goodwin "believe[d] [he] was disciplined because of [his] age (60) and in retaliation for filing an internal age discrimination complaint . . . ."[215]  Mr. Goodwin also said that he believed "that employees in [his] protected category experience disparate impact due to promotion requirements that require a college degree."[216]  On the intake questionnaire, Mr. Goodwin alleged that he was a "victim of a policy that has a disparate impact."[217]

On November 16, 2017, Mr. Cunningham learned that Mr. Goodwin failed to provide a third-party inspector, Truesdail Laboratories, Inc., with information that was requested on October 25, 2017.[218]  Truesdail asked Mr. Goodwin for the information "as soon as possible."[219]  Mr. Goodwin initially responded on October 27, 2017, and indicated that he had forwarded the request to Engineering.[220]  Derek Oldsen, the Engineering Manager, told Mr. Cunningham that Mr. Oldsen

---

[211] *Id.* ¶ 89.

[212] *Id.*

[213] Ex. G to DeVous Decl. (Doc. 48-4) at 31.

[214] *Id.*

[215] *Id.*

[216] *Id.*

[217] *Id.* at 36.

[218] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶¶ 75, 77; Ex. GG to Cunningham Decl. (Doc. 48-2) at 237.

[219] Ex. GG to Cunningham Decl. (Doc. 48-2) at 237.

[220] *Id.*

received no such request on or prior to October 27, 2017.[221]   Mr. Goodwin asserts, without evidence, that he took a copy of the request to Mr. Oldsen.[222]   Documentary evidence first shows Mr. Goodwin asking Mr. Oldsen for guidance on November 16, 2017, over two weeks after the initial request from Truesdail.[223]

On December 29, 2017, Mr. Cunningham hand delivered a termination letter to Mr. Goodwin.[224]   Mr. Cunningham signed the letter.[225]   The letter stated:

> On September 5, 2017, you received correspondence from NIBCO's WHQ HR outlining a series of your performance deficiencies going back to April 20, 2017. This letter concluded with a requirement to complete leadership and performance improvement.  I have included a copy of that letter for your reference.
>
> To support your leadership development, you were provided with two books to read and discuss.  The first was "21 Irrefutable Laws of Leadership" and the second was "21 Indispensable Qualities of a [L]eader."   Your leadership development assignment was to answer the questions and complete the assignments in each book or write a summary of the chapters describing what you had learned and how it could benefit you.  Your first two assignments were turned in late.  The rest of the assignments showed little effort on your part with vague responses and a weak attempt to describe any benefit from the lessons of the books.   My overall impression is that this improvement activity failed due to your own lack of interest or effort.
>
> In addition, your job performance has shown no significant improvement.  Your time management skills have no noticeable improvement and your ability to accurately and timely complete the materials and testing certifications for our customers is well below expectations.
>
> As a result, it is the company's decision to terminate your employment with NIBCO effective December 29, 2017.[226]

---

[221] *Id.* at 235.

[222] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 75.

[223] Ex. GG to Cunningham Decl. (Doc. 48-2) at 236; *see also* Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 76 (stating that Mr. Goodwin did not provide the requested information over two weeks after the information was requested).

[224] Ex. 27 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 26.

[225] *Id.*

[226] *Id.*

### D.  *After the Termination*

NIBCO eliminated Mr. Goodwin's position (Compliance Coordinator), and Mr. Goodwin's responsibilities were absorbed by current NIBCO employees.[227]  Specifically, Derek Oldsen (about 36 years old at the time) took over the compliance responsibilities, Mr. Brooks (about 48 years old at the time) "began reporting directly to [Mr.] Cunningham regarding environmental responsibilities," and Mr. Cunningham (about 52 years old at the time) "took over the safety and management responsibilities."[228]

On June 26, 2018, Mr. Goodwin filed a second formal charge with the EEOC.[229]  In this charge, Mr. Goodwin alleged that he experienced age discrimination and was terminated in retaliation for his discrimination complaints and for filing the first EEOC charge.[230]  Mr. Goodwin also alleged that Mr. Cunningham's actions constituted "ongoing harassment to force me to retire or set me up for termination."[231]

### Discussion

A court shall grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[232]  The moving party has the burden to show that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's

---

[227] Pl.'s Resp. to Statement of Facts (Doc. 64) ¶ 88.

[228] *Id.* ¶ 89; *see also id.* ¶ 6, (listing Mr. Cunningham's current age as 55); *id.* ¶ 34 (listing Mr. Brook's current age as 51); *id.* ¶ 41 (listing Mr. Oldsen's current age as 39).

[229] Ex. H to DeVous Decl. (Doc. 48-4) at 38.

[230] *Id.* at 41.

[231] *Id.*

[232] *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing FED. R. CIV. P. 56(c)(2)).

26

case.[233]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[234]

Importantly, "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment . . . ."[235]  The dispute of fact must be both genuine and material to prevent summary judgment.[236]  A genuine dispute of fact exists where a rational juror could decide the particular question of fact for the nonmoving party.[237]  A material dispute of fact exists where the juror's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[238]

### A.    *Failure to Exhaust Administrative Remedies*

Mr. Goodwin alleges that NIBCO's failure to promote him to a Level 5 constituted age discrimination.[239]  NIBCO argues that Mr. Goodwin's failure-to-promote claim fails because he did not administratively exhaust his remedies.[240]  NIBCO is right.

The Eighth Circuit says that "[t]he proper exhaustion of administrative remedies gives the plaintiff a green light to bring his or her employment-discrimination claim, along with other

---

[233] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[234] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[235] *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

[236] *Id.*

[237] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[238] *Id.*

[239] Pl.'s Am. Compl. (Doc. 7) ¶¶ 27, 34.  Mr. Goodwin also mentions a demotion in his Amended Complaint.  *Id.* ¶ 29.  Mr. Goodwin may be referencing the change in his job title from Compliance Manager to Compliance Coordinator.  *See supra* page 4.  The Court doubts that Mr. Goodwin administratively exhausted this claim, but NIBCO has not pressed this argument, thus the Court will not address it.  *See Kirklin v. Joshen Paper & Packaging of Ark. Co.*, 911 F.3d 530, 534 (8th Cir. 2018) (explaining that "[f]ailure to exhaust administrative remedies is an affirmative defense that a defendant must prove").

[240] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 15.

allegations that are 'like or reasonably related' to that claim, to federal court."[241]   To properly exhaust administrative remedies, the ADEA requires an individual to file an administrative charge of discrimination with the EEOC "within 180 days after the alleged unlawful practice occurred . . . ."[242]   The Eighth Circuit directs the Court to "liberally construe an administrative charge for exhaustion of remedies purposes . . . ."[243]   But "there is a difference between liberally reading a claim which lacks specificity, and inventing, *ex nihilo*, a claim which simply was not made."[244] "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC 'investigation which could reasonably be expected to grow out of the charge of discrimination.'"[245]

Mr. Goodwin's November 6, 2017 EEOC complaint does not reasonably relate to NIBCO's decision to deny Mr. Goodwin a promotion from Level 4 to Level 5.  Mr. Goodwin's EEOC complaint identifies the "dates discrimination took place" as between August 1, 2017 and September 5, 2017.[246]   Recall that Mr. Goodwin was denied the promotion from Level 4 to Level 5 in April of 2017.  The promotion denial date falls well outside the dates of discrimination listed

---

[241] *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996)).

[242] 29 U.S.C. § 626(d)(1)(A).

[243] *Parisi*, 400 F.3d at 585.

[244] *Id.* (quoting *Shannon*, 72 F.3d at 684).

[245] *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir. 2000) (quoting *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir.1988)).

[246] Ex. G to DeVous Decl. (Doc. 48-4) at 31.  In Mr. Goodwin's Amended Complaint, he made a passing reference to NIBCO's policy requiring a college degree for a promotion to Level 5.  Pl.'s Am. Compl. (Doc. 7) ¶ 26. Specifically, Mr. Goodwin says that "[t]he policy had a substantial adverse impact on older employees of Plaintiff's generation." *Id.*  Mr. Goodwin does not allege that the policy had a disparate impact on the protected class (people 40 and older).  The Eighth Circuit does not recognize disparate-impact claims brought on behalf of "subgroups" of the protected class.  *E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 950–51 (8th Cir. 1998).  There are absolutely no facts in the record from which a rational juror could conclude the college-degree requirement had a substantial disparate impact on any group or subgroup.  So even if the Court construed Mr. Goodwin's charge to include a disparate-impact claim, that claim would not survive summary judgment.

in the EEOC complaint.  Because failure to promote constitutes a discrete adverse employment action, the EEOC complaint does not encompass it.

The August 1, 2017 through September 5, 2017 timeframe matches up incredibly well to the obvious focus of the EEOC complaint.  That complaint reads as follows:

> I was hired in 1976; my current position is Compliance Manager.  In early August 2017, I was subjected to disparaging comments because of my age (60).  On August 3, 2017, I filed an internal complaint alleging age discrimination by my immediate supervisor.  On the same day, I received a written warning and was placed on a performance improvement plan.
>
> I believe that I was disciplined because of my age (60) and in retaliation for filing an internal age discrimination complaint, in violation of the Age Discrimination in Employment Act of 1967 as amended.  I also believe that employees in my protected category [] experience disparate impact due to promotion requirements that require a college degree.[247]

It is clear from the timeframe and foregoing text that Mr. Goodwin was complaining to the EEOC about alleged age-related disparaging comments, alleged inappropriate discipline because of his age, and alleged retaliation for internally reporting age discrimination.

It is true that, in the last line of the EEOC complaint, Mr. Goodwin also said that he believed "that employees in my protected category [] experience disparate impact due to promotion requirements that require a college degree."[248]  But this sentence does not identify a discrete adverse employment action for the EEOC to investigate.[249]

### B.  *Age Discrimination*

Mr. Goodwin alleges that he was demoted and ultimately terminated because of his age. "The ADEA prohibits discrimination against employees, over the age of 40, because of their

---

[247] Ex. G to DeVous Decl. (Doc. 48-4) at 31.

[248] *Id.*

[249] If Mr. Goodwin was trying to include his April 2017 promotion denial in the EEOC complaint, he would not have identified the discrimination timeframe as August 1, 2017 to September 5, 2017.

age."[250]   At a trial, Mr. Goodwin would bear the burden of proving "by a preponderance of the evidence that age was the but-for cause of the challenged employer decision."[251]   On summary judgment, the Court asks whether, on the record before it, a rational juror could conclude that Mr. Goodwin met his burden.   A plaintiff can rely on direct evidence of age discrimination or the familiar *McDonnell Douglas* burden-shifting framework.

"Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."[252]   The closest Mr. Goodwin can come to saying he has direct evidence would be: (1) the conversation between Mr. Cunningham and Mr. Goodwin respecting Mr. Goodwin's ability to perform accident investigations; (2) Mr. Cunningham's questioning of Mr. Goodwin about when Mr. Goodwin was planning on retiring; and (3) Mr. Cunningham's Powerpoint presentation to the Senior Leadership Team showing that Mr. Goodwin was expected to retire in five years.   No rational juror could conclude that evidence of these events is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision . . . ."[253]   Here's why.

First, the events described took place back toward the beginning of 2016.   There is a long distance temporally between the 2016 events and the alleged August–December 2017 discrimination.[254]   There are no allegations of age-related discrimination in the intervening time period.   Second, the earliest mention of succession planning in the record is Mr. Goodwin's

---

[250] *Canning v. Creighton Univ.*, 995 F.3d 603, 610 (8th Cir. 2021) (quoting *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 798 (8th Cir. 2014)).

[251] *Id.* at 611; *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

[252] *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 620 (8th Cir. 2017).

[253] *Aulick*, 860 F.3d at 620.

[254] The alleged demotion in 2016 plays no part in the temporal analysis because it was not a demotion at all.  *See infra* page 33.

voluntary mention to Mr. Cunningham (around the time Mr. Cunningham became Plant Manager) that Rob Brooks would be a good successor to Mr. Goodwin when Mr. Goodwin retired.  Given that this succession issue was first raised by Mr. Goodwin, Mr. Cunningham's later return to that question is not direct evidence of age discrimination.  Third, Mr. Cunningham's candid succession planning was not limited to Mr. Goodwin.  Mr. Cunningham asked other leaders about their retirement plans.[255]  Engaging in succession planning (including asking when leaders might retire) is not in and of itself evidence of age discrimination.[256]  Indeed, the fact that Mr. Cunningham suggested on the 2016 Powerpoint slide that Mr. Goodwin was going to retire in five years is actually evidence that there was no intention to force Mr. Goodwin out earlier due to age.  Fourth and finally, Mr. Cunningham's brief interrogation of Mr. Goodwin about whether Mr. Goodwin could properly perform accident investigations is not direct evidence of age discrimination—even Mr. Goodwin acknowledges that Mr. Cunningham never said the questions had anything to do with age.

So Mr. Goodwin is left with *McDonnell Douglas*.[257]  Under *McDonnell Douglas*, at trial, "the plaintiff must satisfy a four-part prima facie case of age discrimination: (1) the plaintiff 'is over 40 years old'; (2) the plaintiff 'met the applicable job qualifications'; (3) the plaintiff 'suffered

---

[255] *See supra* note 13

[256] *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 796 (8th Cir. 2019).  At the motion hearing, Mr. Goodwin suggested that Mr. Cunningham's comments regarding Mr. Goodwin's retirement constituted evidence of pretext for age discrimination.  May 5, 2021 Hr'g Tr. at 72–73.  The Eighth Circuit has stated that it did "not think that suggesting retirement to an employee who is eligible for retirement, and who is not performing satisfactorily, provides a reasonable basis for inferring age discrimination."  *Ziegler v. Beverly Enters.-Minn., Inc.*, 133 F.3d 671, 676 (8th Cir. 1998).  This reasoning is applicable here.  Mr. Cunningham's statements related to Mr. Goodwin's retirement would not chin the bar with a rational juror.

[257] "While [the Eighth Circuit has] applied *McDonnell Douglas* to ADEA claims when addressing them along with other discrimination claims, it is unclear whether *McDonnell Douglas* technically applies to the ADEA because the ADEA has a 'but-for' causation standard rather than the mixed motives standard used in other statutes."  *Heisler* 931 F.3d at 794.  The Eighth Circuit has made clear, though, "that a plaintiff who fails to meet the lower standard of Title VII . . . necessarily fails to meet the ADEA's standard as well."  *Id.*  Accordingly, because no rational juror could conclude that Mr. Goodwin's discrimination claims survive under *McDonnell Douglas*, the Court need not "reach the ADEA's separate burden . . . ."  *Id.*

an adverse employment action'; and (4) 'there is some additional evidence that age was a factor in the employer's termination decision.'"[258]   The Eighth Circuit has noted that the last prong can be "established by demonstrating the plaintiff was replaced by a substantially younger individual."[259] If a plaintiff establishes a prima facie case, the burden of production "shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination."[260]   If that happens, the onus

---

[258] *Canning*, 995 F.3d at 611 (quoting *Tramp*, 768 F.3d at 800).   If I am reading the cases correctly, there appears to be some conflict in the Eighth Circuit precedent with respect to the proper characterization of the prima facie test. Consider two 2021 decisions.   In *Canning*, quoted above, the Eighth Circuit said:

> the plaintiff must satisfy a four-part prima facie case of age discrimination: (1) the plaintiff "is over 40 years old"; (2) the plaintiff "met the applicable job qualifications"; (3) the plaintiff "suffered an adverse employment action"; and (4) "there is some additional evidence that age was a factor in the employer's termination decision."

*Id.* (quoting *Tramp*, 768 F.3d at 800).   In *Starkey v. Amber Enterprises, Inc.*, the Eighth Circuit said:

> To establish a prima facie case, a plaintiff must show she "(1) was at least forty years old, (2) suffered an adverse employment action, (3) was meeting [her] employer's legitimate expectations at the time of the adverse employment action, and (4) was replaced by someone substantially younger."

987 F.3d 758, 763–64 (8th Cir. 2021) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012)). The Eighth Circuit has not expressly explained whether these differing standards apply in different contexts.   It may be worth resolving this tension or providing guidance as to what circumstances dictate using one standard over the other.   That being said, it appears as though the standard set out in *Starkey* is the appropriate standard in termination cases.   In *Halsell v. Kimberly-Clark Corp.*, the Eighth Circuit cited a First Circuit case where that court modified the failure-to-hire-prima-facie standard to fit a termination claim.   683 F.2d 285, 290 (8th Cir. 1982) (citing *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013–14 (1st Cir. 1979)).   The First Circuit said that a plaintiff must "show that he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative."   *Loeb*, 600 F.2d at 1013.   The Eighth Circuit seemingly adopted this modification, stating that a plaintiff must show "that he was qualified for the job in the sense that his performance met [the employer's] legitimate expectations."   *Halsell*, 683 F.3d at 290.   The Eighth Circuit has since applied the "legitimate expectations" test and specifically analyzed a plaintiff's prima facie showing in light of the plaintiff's job performance. *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 729 (8th Cir. 2002).

The *Canning* standard is more plaintiff friendly.   So the Court will use it out of an abundance of caution.   If the Court applied the *Starkey* standard, Mr. Goodwin presents no evidence upon which a rational juror could conclude that Mr. Goodwin has met his prima facie case on the fourth element with respect to his demotion or termination. No one (substantially younger or otherwise) replaced Mr. Goodwin in the role of Compliance Manager when his title changed and no one assumed his role of Compliance Coordinator when he was fired.   *See Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013) (holding that a plaintiff failed to meet her prima facie case because she presented insufficient evidence that she was replaced by "someone substantially younger").   No rational juror could find for Mr. Goodwin on the "legitimate expectations" prong of the *Starkey* test given the multiple safety lapses, certification issues, and Mr. Cunningham's overall belief that Mr. Goodwin was not displaying the leadership qualities Mr. Cunningham expected.   In any event, because a rational juror could not conclude that NIBCO's proffered reasons for terminating Mr. Goodwin were pretext for age discrimination, which prima-facie standard the Court uses does not change the outcome of this case.

[259] *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 523 (8th Cir. 2010).

[260] *Canning*, 995 F.3d at 611.

returns to the plaintiff "to show that the employer's reason was pretext for discrimination."[261]

With respect to his alleged demotion (the change in title from Compliance Manager to Compliance Coordinator), no rational juror could find that Mr. Goodwin makes out a prima facie case. Mr. Goodwin meets the first two elements: he was over 40 and he met the job qualifications. But Mr. Goodwin completely fails to provide any evidence that he suffered an adverse employment action. Mr. Goodwin testified that his responsibilities, pay, and benefits did not change with his title.[262] In the Eighth Circuit, "[b]ecause there was no reduction in pay, benefits, or status, [Mr. Goodwin's] change in title fails to give rise to an adverse employment action."[263] The Court grants summary judgment in favor of NIBCO on Mr. Goodwin's demotion claim.

NIBCO argues that Mr. Goodwin cannot meet his summary judgment prima facie burden for the termination claim because the record conclusively shows that Mr. Goodwin was not meeting NIBCO's "legitimate expectations."[264] The Court disagrees. Mr. Goodwin worked for NIBCO for over forty years at the time of his termination. He occupied the role of Compliance Coordinator (or Manager) for nearly seventeen of those years. True, 2017 witnessed quite a few hiccups in Mr. Goodwin's performance, but a rational juror could conclude that Mr. Goodwin "'met the applicable job qualifications.'"[265] NIBCO does not argue that Mr. Goodwin cannot meet the three other prima-facie prongs. As such, for purposes of summary judgment, the Court assumes that a rational juror could conclude that Mr. Goodwin has carried his initial burden. NIBCO is up next.

---

[261] *Id.*

[262] Goodwin Depo. (Doc. 48-5) at 73:5–13.

[263] *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *see also Curby v. Solutia, Inc.*, 351 F.3d 868, 873–74 (8th Cir. 2003) (holding that the plaintiff's change in position did not constitute an adverse employment action because there was no reduction in pay or benefits).

[264] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 19.

[265] *Canning*, 995 F.3d at 611.

NIBCO has presented "legitimate, nondiscriminatory reason[s]" for Mr. Goodwin's termination.[266]   Specifically, NIBCO states that Mr. Cunningham lost confidence in Mr. Goodwin's ability to lead.[267]  This loss, NIBCO argues, was brought about by Mr. Goodwin's poor leadership, poor time-management skills, inability to follow directives, inability to complete certifications, lack of effort on the leadership assignments, and Mr. Goodwin's failure to improve.[268]  These deficiencies were highlighted in Mr. Goodwin's termination letter.[269]

Plenty of undisputed facts support NIBCO's asserted reasons.  It is undisputed that Mr. Goodwin let respirator-fit tests lapse for multiple employees.  It is undisputed that Mr. Goodwin allowed other safety trainings to lapse.  It is undisputed that Mr. Cunningham highlighted the emergent nature of these lapses and that Mr. Goodwin's scheduled fixes did not embrace the time-sensitive nature of these failings.  It is undisputed that Mr. Goodwin did not begin safety inspections as directed by Mr. Cunningham.  It is undisputed that Mr. Goodwin was expected to conduct a safety meeting that he did not himself attend and that he failed to properly alert his superiors that he could not attend.  It is undisputed that Mr. Goodwin did not attend Safety Committee meetings after Mr. Cunningham (Mr. Goodwin's boss) indicated that he thought Mr. Goodwin's attendance would be helpful.

There's more.  It is undisputed that Mr. Goodwin submitted an incorrect certification to ARAMCO.  It is undisputed that Mr. Goodwin played a role in submitting inadequate certifications for a valve shipment bound for Ecuador.  It is undisputed that Mr. Goodwin told Truesdail Labs that he would provide them with information as soon as possible and then waited two weeks before

---

[266] *Starkey*, 987 F.3d at 764.

[267] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 21–22.

[268] *Id.* at 22.

[269] Ex. 27 to Pl.'s Decl. of Authenticity (Doc. 63-2) at 26.

involving Engineering.  It is undisputed that Mr. Goodwin did not timely submit his leadership assignments.  It is true that a rational juror could conclude that Mr. Goodwin was not responsible for all of the certification issues NIBCO lays at his feet, but that doesn't negate the mistakes Mr. Goodwin made.  In short, NIBCO has satisfied its burden of production by articulating "legitimate, nondiscriminatory reason[s] for [Mr. Goodwin's] termination."[270]  It's Mr. Goodwin's turn again.

"The burden now shifts back to [Mr. Goodwin] to show these reasons offered by [NIBCO] are, in fact, pretext for age discrimination."[271]  The Eighth Circuit requires Mr. Goodwin to "present evidence, that considered in its entirety (1) creates a fact issue as to whether [NIBCO's] proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision."[272]  Because the ADEA requires but-for causation, "proof that the [reasons are] false is necessary, but not sufficient, to show a pretext for discrimination under the ADEA."[273]  Stated differently, Mr. Goodwin must provide evidence upon which a rational juror could conclude "that [NIBCO's] stated reason was false and that age discrimination was the real reason."[274]

Mr. Goodwin has not done so at all.  At the motion hearing, Mr. Goodwin argued that Mr. Cunningham's inconsistent discipline-related and discrimination-related statements could evidence pretext.[275]  Specifically, Mr. Goodwin points to Mr. Cunningham's comment regarding complaints from ARAMCO and Mr. Cunningham's misrepresentation of the email from

---

[270] *Canning*, 995 F.3d at 611.

[271] *Aulick*, 860 F.3d at 621.

[272] *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011).

[273] *Id.*

[274] *Id.*

[275] May 5, 2021 Hr'g Tr. at 78–81.

ARAMCO where ARAMCO complained of disingenuous certification practices.[276]   A rational juror could conclude that Mr. Cunningham's assertion that Mr. Goodwin received two complaints from ARAMCO is not accurate and that ARAMCO's "disingenuous" statement referred to NIBCO's certification process (not Mr. Goodwin).[277]   But Mr. Goodwin provides no evidence upon which a rational juror could conclude that "age discrimination was the real reason" for his termination.[278]   Perhaps Mr. Cunningham did not like Mr. Goodwin for personal reasons unrelated to his age.   Perhaps Mr. Cunningham did not like that Mr. Goodwin kept oscillating between resignation threats and raise requests.   The point is that Mr. Goodwin has not presented any evidence of pretext *for age discrimination*.[279]

Let me be clear.   This record leaves the impression that Mr. Cunningham was not a particularly good manager or nice colleague, at least with respect to Mr. Goodwin.   But the Eighth Circuit has repeatedly stated that "[f]ederal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'"[280]   And "hostile treatment by a manager based on employee conduct and not motivated by any protected characteristic or conduct,

---

[276] *Id.* at 79–80.

[277] *See supra* note 71 (discussing the "disingenuous" issue).

[278] *Tusing*, 639 F.3d at 516.

[279] Mr. Goodwin's best argument here is that Mr. Cunningham's retirement comments and Mr. Cunningham's questions regarding Mr. Goodwin's ability to perform his job (*see supra* pages 30–31) are enough to allow a rational juror to conclude NIBCO's proffered legitimate reasons were pretext for age discrimination.   Just as no rational juror could conclude that those actions constitute direct evidence of age discrimination, no rational juror could conclude that those actions are any evidence at all of pretext for age discrimination.   There is nothing in the record to allow a rational juror to make the causal link between these actions and the discipline and termination in 2017.   *Id.*

[280] *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 686 (8th Cir. 2002) (*Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir.2001)); *see also Canning*, 995 F.3d at 612 (quoting *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 880–81 (8th Cir. 2010) ("Federal Courts do not sit as a super-personnel department that reexamines an entity's business decisions.").

even if unreasonable, does not amount to a legally actionable type of discrimination."[281]  The Court grants summary judgment to NIBCO on Mr. Goodwin's age-discrimination claim as it relates to his termination.

### C.    *Retaliation*

Mr. Goodwin alleges that NIBCO retaliated against him because of the internal age discrimination complaint he lodged against Mr. Cunningham on August 3, 2017.[282]  Specifically, Mr. Goodwin alleges that NIBCO retaliated against him by: (1) requiring him to conduct daily safety inspections of the entire plant; (2) excluding him from the Senior Leadership Team meetings; (3) requiring him to prepare presentations to be delivered by younger staff members; (4) refusing to give him a key to his own office; and (5) terminating him.[283]

"The ADEA prohibits an employer from discriminating against an employee because the employee opposed a practice made unlawful by the ADEA."[284]  As with his age-discrimination claim, Mr. Goodwin can rely on direct evidence or the *McDonnell Douglas* burden-shifting analysis to establish retaliatory motive.

As mentioned, "[d]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." [285] The record is devoid of such evidence.  There is not even a whiff of evidence upon which a rational juror could find a *specific* link between Mr. Goodwin's internal complaint and any of the alleged

---

[281] *Heisler*, 931 F.3d at 796.

[282] Pl.'s Am. Compl. (Doc. 7) ¶¶ 40–46; *see also* Ex. P (Formal Complaint) to Pankey Decl. (Doc. 48-3) at 99.

[283] Pl.'s Am. Compl. (Doc. 7) ¶ 42–43, 46–47.

[284] *Kneibert v. Thomson Newspapers, Mich. Inc.*, 129 F.3d 444, 454 (8th Cir. 1997).

[285] *Aulick*, 860 F.3d at 620.

adverse employment actions.[286]  Again, Mr. Goodwin must be relying on the *McDonnell Douglas* framework.

"Under this framework, [at trial] the initial burden is on [Mr. Goodwin] to establish a prima facie case, consisting of evidence: '(1) that he . . . engaged in statutorily protected activity; (2) an adverse employment action was taken against him . . .; and (3) a causal connection exists between the two events.'"[287]  If Mr. Goodwin does that, then NIBCO must "show a 'non retaliatory reason for the adverse employment action.'"[288]  If NIBCO does so, "the burden returns to [Mr. Goodwin] who is then obliged to present evidence that (1) creates a question of fact as to whether [NIBCO's] reason was pretextual and (2) creates a reasonable inference that [NIBCO] acted in retaliation."[289]  NIBCO argues that Mr. Goodwin cannot show any evidence that would allow a rational juror to find "but-for" causation under *McDonnell Douglas*.[290]

Timing alone clears some of the underbrush on this claim.  Mr. Goodwin submitted his complaint to NIBCO after his meeting with Ms. Pankey and Mr. Cunningham on August 3, 2017.[291]  That complaint constitutes protected activity.  But even if the additional safety inspections, NIBCO's refusal to give Mr. Goodwin a key to his office, Mr. Goodwin's removal from the Senior Leadership Team, and Mr. Goodwin's preparation of presentations for younger

---

[286] NIBCO's response to Mr. Goodwin's internal discrimination complaint references disciplinary actions against Mr. Goodwin (remedial leadership training and putting Mr. Goodwin on a performance improvement plan).  Ex. F to DeVous Decl. (Doc. 48-4) at 28–29.  However, these actions were taken before Mr. Goodwin made the internal complaint.  *See id.* (stating that these remedial actions were discussed in Mr. Goodwin's August 3, 2017 counseling session).  Recall that Mr. Goodwin made the internal complaint after his August 3, 2017 counseling meeting.  *See supra* note 138.

[287] *Stewart v. Independent Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir.2006)).

[288] *Id.*

[289] *Id.* (internal quotations omitted).

[290] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 29–31.

[291] *See supra* note 138.

employees constituted adverse employment actions, Mr. Goodwin is still out of luck because each of these actions predated the protected activity.[292]  The Eighth Circuit makes clear that "alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."[293]  In other words, a rational juror could not find a causal link between Mr. Goodwin's complaint and these actions.

With respect to Mr. Goodwin's termination-as-retaliation claim, a rational juror could conclude that he engaged in protected activity (filing the complaint) before suffering an adverse employment action (his termination).  Mr. Goodwin therefore meets (for summary judgment purposes) the first two prongs of his prima facie case.  NIBCO argues that Mr. Goodwin's "poor behavior" coupled with the nearly five-month span between Mr. Goodwin filing the internal complaint and his termination prevent a rational juror from finding causation (the third prong).[294]

The Eighth Circuit makes clear that "a gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive, and that, given a delay of sufficient length, the causal nexus tends to evaporate."[295]  The record does not reveal that NIBCO treated Mr. Goodwin any differently after he filed his internal complaint.  Indeed, some of the conduct that Mr. Goodwin says was discriminatory occurred before he made the internal complaint.[296]  This lack of changed behavior means that temporal proximity of the internal

---

[292] *See supra* note 118 (showing that Mr. Cunningham assigned the safety inspections on August 2, 2017); Ex. P (Formal Complaint) to Pankey Decl. (Doc. 48-3) at 99 (mentioning Mr. Goodwin's removal from the Senior Leadership Team); *supra* note 103 (showing that Mr. Goodwin moved into his office before the complaint was filed); Pl.'s Answer to Interrogatories (Doc. 48-6) at 20 (stating that, "[a]s of 8/3/2017," another NIBCO employee will be presenting the safety portion of a presentation).  It is undisputed that all of these actions predated Mr. Goodwin's internal complaint and his November 6, 2017 EEOC charge.

[293] *Stewart*, 481 F.3d at 1044.

[294] Br. in Supp. of Def.'s Mot. for Summ. J. (Doc. 49) at 30.

[295] *Stewart*, 481 F.3d at 1044 (internal quotations and citations omitted)

[296] *See supra* note 292.

complaint to the termination is all Mr. Goodwin can rely upon to support causation.  For temporal proximity "alone to be sufficient, 'the temporal proximity must be very close.'"[297]  The Eighth Circuit has held that a period of two weeks between protected activity and an adverse employment action was close enough, "but barely so."[298]  The Eighth Circuit also has held that one month between protected activity and an adverse employment action was not close enough.[299]  Here, Mr. Goodwin's termination occurred nearly five months after he filed the internal complaint.

Additionally, Mr. Goodwin's conduct after he filed the complaint further removes any indicia of retaliatory motive.  Recall that Mr. Goodwin failed to conduct the safety inspections as directed, failed to consult with Engineering respecting the Valero information, allowed significant lapses in safety training and safety compliance, and failed to timely submit his leadership assignments.  Mr. Goodwin's "intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination."[300]  Any causal link has thus evaporated.[301]  No rational juror could conclude otherwise.

Even assuming Mr. Goodwin could establish his prima facie case, the result would be the same.  NIBCO has offered legitimate, nonretaliatory reasons for Mr. Goodwin's termination.  No rational juror could conclude that those reasons were pretext *for retaliation*.  Again, apart from his termination, Mr. Goodwin's complained-of actions predate his protected conduct.  With respect to

---

[297] *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006)).

[298] *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir.2002).

[299] *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir. 2010).

[300] *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (analyzing a retaliation claim under the Americans with Disabilities Act).

[301] While it would be a closer call, the same would be true if a rational juror analyzed the facts in light of Mr. Goodwin's November 6, 2017 EEOC charge.  A month and a half passed between that charge and the termination.  Without more, as stated above, a month and a half is too long to meet the third prong of Mr. Goodwin's prima facie case.

Mr. Goodwin's termination, the Court's analysis of the discrimination claim applies equally here. Even if one thought there was some evidence of the proffered legitimate reasons being pretext, there is no evidence that they were pretext *for retaliation*.[302]  The Court grants summary judgment to NIBCO on Mr. Goodwin's retaliation claims.

### D.   *Hostile Work Environment*

The Court also grants summary judgment to NIBCO on Mr. Goodwin's hostile-work-environment claim.  Mr. Goodwin alleges that Mr. Cunningham engaged in a pattern of harassment designed to force Mr. Goodwin to quit or retire.[303]  To survive summary judgment, Mr. Goodwin must present evidence that would allow a rational juror to conclude that: (1) he is over 40, (2) he was subjected to unwelcome harassment, (3) "the harassment resulted from his membership in the protected class, and [(4)] that the harassment was severe enough to affect the terms, conditions, or privileges of his employment."[304]  To meet the fourth element, the harassment must be "'severe or pervasive enough to create an objectively hostile or abusive work environment' and the victim must subjectively believe [his] working conditions have been altered."[305]  The Supreme Court says that "[t]hese standards for judging hostility are sufficiently demanding to ensure that [the ADEA] does not become a 'general civility code.'"[306]

Mr. Goodwin alleges that Mr. Cunningham added unnecessary responsibilities to his workload, demoted him, isolated him, removed him from the Senior Leadership Team, made false accusations against him, and questioned him about his retirement plans and his ability to do his

---

[302] *See supra* pages 35–36.

[303] Pl.'s Am. Compl. (Doc. 7) ¶ 31.

[304] *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922 (8th Cir. 2018) (cleaned up).

[305] *Id.* (quoting *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009)).

[306] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing hostile environment under Title VII).

job.[307] The record supports some of these allegations. For instance, Mr. Cunningham did reassign Mr. Goodwin to a markedly inferior office and did not give Mr. Goodwin a key. A rational juror could conclude that Mr. Cunningham fabricated or misinterpreted ARAMCO's certification complaints. Mr. Cunningham directed Mr. Goodwin to conduct safety inspections. Mr. Cunningham told Mr. Goodwin that he would not make it at NIBCO if he stayed. Mr. Cunningham expressed displeasure with Mr. Goodwin's decision to rescind his resignation. And Mr. Cunningham inquired into Mr. Goodwin's capabilities and retirement plans.

Mr. Goodwin was over forty and a rational juror could find that Mr. Cunningham's conduct could be considered harassment (though that is doubtful). No rational juror could find for Mr. Goodwin on the remaining elements. First, Mr. Goodwin has not presented any evidence upon which a rational juror could "link[] any of these allegedly harassing actions to his age . . . ."[308] He speculates that such is the case, but speculation exits stage left on summary judgment. Second, Mr. Goodwin has presented no evidence upon which a rational juror could conclude that the complained-of conduct rises to the level of objectively hostile.

The Court sympathizes with Mr. Goodwin's sincere belief that he was put out on an island and not treated with the courtesy one would expect to receive from a reasonable supervisor. The Court also questions whether Mr. Cunningham intentionally increased Mr. Goodwin's workload in hopes that Mr. Goodwin would submit a third and lasting resignation. But no rational juror could use this record to find any links between Mr. Cunningham's treatment of Mr. Goodwin and Mr. Goodwin's age. And the Eighth Circuit sets a "stringent hostile work environment standard[,] designed to 'filter out complaints attacking the ordinary tribulations of the workplace . . . .'"[309]

---

[307] Pl.'s Am. Compl. (Doc. 7) ¶ 31–47; Pl.'s. Answer to Interrogatories (Doc. 48-6) at 15–24.

[308] *Moses*, 894 F.3d at 923.

[309] *Id.*

42

With that standard in mind, no rational juror could conclude that Mr. Goodwin's experiences went beyond ordinary workplace tribulations.  In sum, no rational juror could conclude Mr. Cunningham created a hostile work environment.

## **Conclusion**

Defendant's Motion for Summary Judgment is GRANTED in its entirety.

IT IS SO ORDERED this 29th day of September 2021.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE